# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Jack Buncher Foundation     :
                                    :
                                    :     No. 306 C.D. 2019
Appeal of: Amy Rubinoff,            :     Argued: February 10, 2020
Caryn Rubinoff, Michael Rubinoff,  :
and Daniel Rubinoff                 :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE J. ANDREW CROMPTON, Judge


*OPINION NOT REPORTED*


**MEMORANDUM OPINION**
**BY JUDGE BROBSON**               **FILED:  July 1, 2020**


Amy Rubinoff, Caryn Rubinoff, Michael Rubinoff, and Daniel Rubinoff (Appellants) appeal from an order of the Court of Common Pleas of Allegheny County, Orphans' Court Division (Orphans' Court), dated February 12, 2019. The Orphans' Court denied Appellants' Petition for Rule to Show Cause Why Declaratory Judgment and Equitable Relief Should Not Be Granted (Petition). For the reasons set forth below, we affirm the Orphans' Court's order.

## I. BACKGROUND

The relevant background facts, which the Orphans' Court found and/or the parties do not appear to dispute, are as follows. Jack Buncher was a successful Pittsburgh businessman, who, following the death of his brother, became the sole shareholder of the Buncher Company (Company). Jack Buncher had 2 children, Stephen Buncher and Bernita Buncher. Bernita Buncher married Richard Rubinoff

in 1958, but they later divorced in 1980. During their marriage, Bernita Buncher and Richard Rubinoff had 4 children, the Appellants in this matter.

In 1974, Jack Buncher established the Buncher-Rubinoff Foundation, a Pennsylvania charitable nonprofit corporation, which later became known as the "Buncher Family Foundation" (Foundation). (Reproduced Record (R.R.) at 71a-77a, 86a-87a.) As stated in the Foundation's original Articles of Incorporation, Jack Buncher created the Foundation "to receive, administer and distribute property exclusively for religious, charitable, scientific, literary and educational purposes." (*Id.* at 72a.) The Foundation's incorporators and original members of its Board of Directors (Board) were Jack Buncher, Joanne Buncher, who was Jack Buncher's wife at the time, Bernita Buncher, and Richard Rubinoff. (*Id.* at 73a-74a.) The Foundation's original Articles of Incorporation also provided that, in the event that the Foundation was dissolved, the Foundation's remaining assets were to "be distributed to or for the use of such corporations, trusts, funds or other organizations, being exempt from federal income tax as organizations described in Section 501(c)(3) of the Internal Revenue Code of 1954 [(Code), 26 U.S.C. § 501(c)(3)] . . . , as the Board . . . shall select." (*Id.* at 76a-77a.) In addition, pursuant to the Foundation's original By-Laws, any future members of the Board were required to be individuals related to Jack Buncher by blood or marriage, if feasible. (*Id.* at 79a.)

On December 4, 1989, the Board, which was then comprised of Jack Buncher, Joanne Buncher, and Bernita Buncher, held its annual meeting. (*Id.* at 2274a-85a.) At the meeting, the Board voted unanimously to strike and replace the Foundation's existing By-Laws with new By-Laws. (*Id.* at 2275a.) Article III, Section 10 of the new By-Laws provided, in relevant part, that: (1) any of Jack Buncher's heirs, with

2

the exception of Stephen Buncher and his heirs, would be entitled to serve on the Board; (2) all appointments to the Board were subject to Jack Buncher's prior approval or, in his absence, the prior approval of "the senior (oldest) Jack [] Buncher heir then serving on the Board"; (3) Jack Buncher or the senior Buncher heir present and serving on the Board was authorized to cast the majority vote on any issue voted on at a meeting of the Board; and (4) Article III, Section 10 of the By-Laws could not be amended without the approval of the senior Buncher family member. (*Id.* at 2277a-78a.) Article X of the new By-Laws further solidified the mandate that Article III, Section 10 of the By-Laws could not be altered, amended, or repealed without the approval of the senior Buncher family member. (*Id.* at 2283a.) At the December 4, 1989 meeting, the Board also approved Thomas Balestrieri (Balestrieri), among others, to serve on the Board and elected Jack Buncher as the Foundation's Chairman of the Board/Chief Operating Officer, Balestrieri as one of the Foundation's Vice Presidents, Bernita Buncher as the Foundation's Secretary and Treasurer, and William Doring (Doring) as the Foundation's Assistant Treasurer. (*Id.* at 2284a-85a.) In addition, the minutes from the Board's December 4, 1989 meeting specifically provide that

> it was [Jack Buncher's] intention that a Buncher family member would always be in control of the Board, and thus in control of the Foundation. It was [Jack Buncher's] hope that the Buncher family and the Board would continue to carry out the traditions of charitable giving that had been established with the creation of the Foundation[.]

(*Id.* at 2285a.)

At a subsequent meeting held on June 14, 1990, the Board voted to make a written statement prepared by Jack Buncher part of the Foundation's records as a philosophy for the future management of the Foundation. (*Id.* at 2288a.) The statement set forth Jack Buncher's personal thoughts and aspirations regarding the

3

Foundation's charitable activities and the long-term preservation and maintenance of the Foundation. (*Id.* at 2287a-88a.) In the statement, Jack Buncher memorialized his intention to make "significant commitments to the United Jewish Federation, to the American Jewish Joint Distribution Committee, and to the World Zionist Organization for the principal purpose of continuing The Buncher Leadership Program." (*Id.* at 2292a.) Jack Buncher also expressed that if there came a time when The Buncher Leadership Program became unworkable, the Board should direct the assets of the Foundation to programs in support of Israel. (*Id.*) Thereafter, on December 3, 1990, the Board's Executive Committee appointed Doring and Joseph Jackovic (Jackovic) to serve on the Board. (Orphans' Ct. Op., Feb. 12, 2019, at 4.)

On March 16, 1994, Jack Buncher, apparently as part of his estate plan, executed a Fourth Restated and Amended Revocable Declaration of Trust, which created the Jack G. Buncher Trust (Trust). (R.R. at 106a-39a.) Section 3.1(a) of the Trust required the trustees to transfer the Company's voting common stock to the Foundation upon Jack Buncher's death. (*Id.* at 109a.) Section 7.1 of the Trust required the trustees to distribute the residue of the Trust to the Foundation, subject to the directives set forth in Schedule B. (*Id.* at 116a.) In Schedule II of Schedule B, Jack Buncher requested that, within 5 years of the date on which the Company's stock is transferred to the Foundation, the Board redistribute and retain the Company's stock as follows: (1) 16% to the United Jewish Federation of Pittsburgh; (2) 8.5% to the American Jewish Joint Distribution Committee; (3) 8.5% to the Zionist Organization of America; (4) 16% to the Riverview Center for Jewish Seniors; (5) 16% to the Jewish Family and Children Service in Pittsburgh; and (6) 35% to remain with the Foundation. (*Id.* at 136a-37a.) Jack Buncher further

4

requested in Schedule B of the Trust that the Board take into consideration his desire to fund The Buncher Leadership Program, but also provided:

> After [his death], the [t]rustees shall have broad discretion, exercisable by them at any time and from time to time, with respect to the identity of the charitable recipients and the amounts, nature and character of property distributed to each, including specifically the powers to vary the percentages set forth in Schedule II[,] to remove the entities specified in such Schedule in whole or in part, to substitute or add other entities therefor or decline to do the same; provided, however, that such organizations shall be described in Section 501(c)(3) [of the Code] and Section 509(a)(1), (2) or (3) of the [Code, 26 U.S.C. § 509(a)(1), (2) or (3).]

(*Id.* at 138a-39a.) The Trust also named Bernita Buncher, M.H. Levy, Balestrieri, and Doring as successor trustees to serve upon Jack Buncher's death.[1] (*Id.* at 119a.)

On December 18, 1996, the Board, which was then comprised of Jack Buncher, Bernita Buncher, Balestrieri, Doring, and Jackovic, held a meeting and thereafter issued a unanimous written consent, whereby the Board amended Article III, Section 10 of the Foundation's By-Laws (1996 By-Laws) to change "senior Buncher heir" to "Senior Buncher Descendent." (*Id.* at 144a-45a.) As of December 21, 1996, the effective date of the amendment, Article III, Section 10 of the Foundation's 1996 By-Laws, which remained substantially the same as when the Board previously amended the By-Laws in December 1989, provided:

> (a) Notwithstanding any other provision in the By-Laws, any [descendant] of Jack G. Buncher, except Stephen Buncher or his descendants, may be entitled to serve on the Board. All appointments to the Board will be subject to the prior approval of Jack G. Buncher, or in his absence, subject to the prior approval of the Senior

---

[1] The Trust also named Mellon Bank, N.A., as a successor corporate trustee, but Jack Buncher later removed Mellon Bank, N.A., by an amendment to the Trust, dated August 15, 1996. (R.R. at 119a, 140a.)

5

Buncher [Descendant] then serving on the Board. If no Buncher [Descendant] is serving on the Board, then Article III, except for this section, shall control.

(b) Notwithstanding anything to the contrary in the By-Laws, Jack G. Buncher or the Senior Buncher [Descendant] present and serving on the Board shall be authorized to cast the majority vote on any issue wherein there is a vote at a Board meeting, and he or she wishes to cast a majority vote. The purpose of this authorization, to cast a majority vote, is to insure that a Buncher family member ([descendant] of Jack G. Buncher) may control the direction and the activities of the Foundation consistent with the purposes of the Foundation.

(c) Notwithstanding any other provision of the By-Laws, this Section 10 of Article III may not be amended without the approval of the Senior Buncher [Descendant] on the Board. A Buncher family member may be removed by the other [D]irectors upon a doctor's certificate of incompetence in the handling of the affairs of the Foundation. If there is a time during which a Buncher family member or members are unwilling or unable to serve as Directors of the Foundation, this Section of the By-Laws will be inoperative and will remain so until such time as a Buncher family member is able and willing to serve as a Director, at which time the then acting Directors will be obligated to appoint the Buncher [descendant] to the Board, which act will reestablish the effectiveness of this Section.

(d) Senior Buncher Descendant shall mean the eldest blood descendant of Jack G. Buncher, excluding Stephen M. Buncher or his descendants.

(*Id.* (emphasis in original).)

Jack Buncher died in 2001. (Orphans' Ct. Op., Feb. 12, 2019, at 5.) Thereafter, the Foundation entered a transition period, during which time the Board discussed various proposed amendments to the Foundation's 1996 By-Laws, as well as different charitable organizations to support. (*Id.* at 5-6.) During a transition meeting held on July 30, 2003, Bernita Buncher announced that the Foundation

6

would align itself with 5 potential organizations: the Carnegie Libraries, Carnegie Mellon University, the American Jewish Joint Distribution Committee, The Pittsburgh Foundation, and the United Jewish Federation. (*Id.* at 5.) Thereafter, on April 6, 2011, the Board, which was then comprised of Bernita Buncher, Doring, Balestrieri, and Jackovic, held a special meeting for the purpose of reviewing, discussing, and amending the Foundation's Articles of Incorporation and 1996 By-Laws. (R.R. at 2313a.) At the meeting, the Board voted to: (1) amend the Foundation's Articles of Incorporation (2011 Articles) to, *inter alia*, change the name of the Foundation to "The Jack Buncher Foundation"; and (2) amend the Foundation's 1996 By-Laws (2011 By-Laws). (*Id.* at 2313a-38a.) Bernita Buncher, Doring, and Jackovic voted in favor of the 2011 Articles and the 2011 By-Laws, while Balestrieri abstained. (*Id.* at 2314a-15a.)

Following the April 6, 2011 Board meeting, the relevant portions of the Foundation's 2011 By-Laws provided as follows. Article I, Section 1.02 of the Foundation's 2011 By-Laws, which set forth the purpose of the Foundation, provided:

> The [Foundation] is incorporated exclusively for religious, charitable, scientific, testing for public safety, literary and educational purposes, to foster national or international amateur sports competition, and for the prevention of cruelty to children and animals . . . [and] shall support organizations and purposes described in Section 501(c)(3) of the Code that promote[, *inter alia*,] . . . programs that further the physical, educational and spiritual needs and well-being of individuals, particularly including those that provide care and services to the elderly and those that serve individuals of the Jewish faith (including education and healthcare in Israel)[.]

(*Id.* at 2323a.) Article I, Section 1.02 also contained language that prohibited its amendment, revision, or restatement once Bernita Buncher was no longer a Director

7

of the Foundation and noted that it would govern the Foundation's "grantmaking activities throughout the duration of the [Foundation's] existence, regardless of whether [Bernita] Buncher [was] then serving as a Director." (*Id.*) Article II, Section 2.02 of the Foundation's 2011 By-Laws granted Bernita Buncher a perpetual term on the Board to serve as a Director of the Foundation until her death, incapacity, or resignation and the sole power to elect and remove the remaining Directors. (*Id.* at 2324a.) Following Bernita Buncher's death, incapacity, or resignation as a Director, Article II, Section 2.03 provided that Doring would succeed to Bernita Buncher's rights with respect to the appointment and removal of Directors. (*Id.*) Article X, Section 10.01 of the Foundation's 2011 By-Laws provided:

> Within [5] years of the later to occur of the cessation of [Bernita] Buncher's tenure as a Director or the cessation of [Doring's] tenure as a Director, the [Foundation] shall retain (i) the Voting Common Stock of the [Company] and (ii) [10%] of the value of the assets of the [Foundation] not consisting of interests in the [Company] and distribute the remaining assets, consisting of all other interests in the [Company], including Non-Voting Common and Preferred Stock, and the remaining [90%] of non-[Company] assets, to The Pittsburgh Foundation, or its successor, provided it is then an organization described in Section 501(c)(3) of the Code to be held in a fund for the purposes set forth in [Article I,] Section 1.02.

(*Id.* at 2336a.)

Subsequently, on April 12, 2017, Appellants filed their Petition, seeking both declaratory and equitable relief. In their Petition, Appellants requested that the Orphans' Court enter an order: (1) declaring the Foundation's 2011 Articles to be invalid; (2) reinstating a prior version of the Foundation's Articles of Incorporation; (3) declaring the Foundation's 2011 By-Laws to be invalid; (4) reinstating a prior version of the Foundation's By-Laws; (5) removing Doring, Balestrieri, and

8

Jackovic as Directors of the Foundation; (6) appointing one of the Appellants, who is both willing and able to serve, to the Board to serve as the Senior Buncher Descendant; and (7) awarding attorneys' fees and costs. Appellants argued that in adopting the 2011 Articles and the 2011 By-Laws, Doring, Balestrieri, and Jackovic breached their fiduciary duties, *inter alia*, by eliminating both the right of a descendant of Jack Buncher to serve on the Foundation's Board and the oversight of a Buncher family member over the Foundation's activities and by failing to act in good faith and solely for the benefit of the Foundation and its beneficiaries rather than their own self interests.[2]

Following a 9-day hearing, the Orphans' Court issued an opinion and order, denying Appellants' requested relief while reserving ruling on the Foundation's request for an award of attorneys' fees and costs. In so doing, the Orphans' Court concluded, *inter alia*, that Appellants had not proven that Doring, Balestrieri, or Jackovic destroyed Jack Buncher's intentions with respect to the Foundation or otherwise breached their fiduciary duties by adopting the 2011 Articles or the 2011 By-Laws. The Orphans' Court reasoned:

> Having thoroughly reviewed the Trust document at issue in this case . . . in conjunction with the By-Laws as amended in 1996, the [Orphans'] Court finds that [Jack] Buncher's intentions are clearly stated in both of these documents. Although the documents set forth a list of charitable beneficiaries in Schedules B and II, respectively, the Trust document states, without

---

[2] Appellants also argued in their Petition that Doring, Balestrieri, and Jackovic breached their fiduciary duties by exercising undue influence over Bernita Buncher given her lack of business sophistication and deteriorating mental condition. On appeal to this Court, Appellants do not appear to challenge the Orphans' Court's finding that Bernita Buncher "was capable of taking care of her own financial and legal affairs, without being influenced by others to make decisions that she did not want to make," and, therefore, we do not discuss this argument in any further detail in this opinion as it is not relevant to this appeal. (Orphans' Ct. Op., Feb. 12, 2019, at 14.)

9

ambiguity, that the [t]rustees have "broad discretion", exercisable "at any time", to identify the charitable recipients and the amount, nature, and character of the property granted to the recipients. Moreover, the document specifically states that the [t]rustees may remove recipients "in whole or in part" and substitute or add other recipients, as long as the recipients are [Section] 501(c)(3) organizations under the [Code]. Thus, the action by the [t]rustees and the Directors of the Foundation in designating new beneficiary organizations was both consistent with [Jack] Buncher's intent, as set forth in both the Trust and the [1996] By-Laws, and authorized by both the words of the [1996] By-Laws and the terms of the Trust document.

[Appellants'] reliance on the minutes of the 1989 Board meeting and [Jack] Buncher's "Some Personal Thoughts" Memo are misplaced. It is undisputed that [Jack] Buncher stated at the 1989 Board meeting that it was his intention to always have a Buncher family member on the Board of the Foundation. That being said, [Jack] Buncher, along with the other Board members, enacted the 1996 amendments [to the By-Laws] that provided that the "senior" Buncher heir (later changed to descendant) serving on the Board was authorized to cast the majority vote on any issue and the [1996] By-Laws regarding Directors could only be amended upon approval of the senior Buncher heir (later changed to descendant) on the Board. These two provisions gave [Bernita] Buncher, who was the "senior heir/descendant" on the Board, majority control and the specific authority to amend the [1996] By-Laws in any fashion. Taking the authority she was given, [Bernita] Buncher, with the vote of [2] of the [3] other members of the Board, properly enacted the 2011 By-Laws.

(Orphans' Ct. Op., Feb. 12, 2019, at 10-11.)

Appellants appealed the Orphans' Court's decision and order to this Court, and the Orphans' Court directed Appellants to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925. In its Rule 1925(a) opinion, the Orphans' Court further reasoned:

10

[Appellants] first claim is that the [Orphans'] Court erred in concluding that the [2011 Articles and 2011 By-Laws] were duly adopted. . . . [O]n April 6, 2011, after several years of discussions and draft by-laws amendments, Bernita Buncher, [Doring], and [Jackovic] voted in favor of the amendments, with [Balestrieri] abstaining. As they were the [4] members of the Board of the [Foundation], . . . they had the authority to enact amendments to the [1996 By-Laws]. [Balestrieri] abstained because he believed that there should be more members of the senior management of the [Company] on the Board and he objected to anyone, other than [Bernita] Buncher, having a majority vote on the Board, due to his belief that no one, other than [Bernita] Buncher, could replace [Jack] Buncher. As the vote was [3] in favor of the amendments and [1] abstention, the [m]otion to amend the [1996 By-Laws] passed and the amendments were duly adopted.

[Appellants'] second claim is that the [Orphans'] Court erred in holding that the Directors of the Foundation did not violate their fiduciary duties in adopting the 2011 amendments. As [D]irectors of [the] Foundation, the Board of Directors have fiduciary duties, including a duty of care and loyalty to the Foundation's mission and goals. By enacting the 2011 amendments, the Directors acted completely properly and demonstrated their loyalty to the future of the Foundation. Specifically, the purpose clause was revised to state as follows: "The [Foundation] is incorporated exclusively for religious, charitable, scientific, testing for public safety, literary and educational purposes, to foster national or international amateur sports, competition, and for the prevention of cruelty to children and animals . . . [.]" Further, the amendments provide for [Bernita] Buncher, who is the "Senior Buncher Descendant", to remain on the Board until her death or incapacity, and then there is a provision for a much-needed succession plan. The Directors' desire to cement the future of the Foundation by ensuring that long-time members of the Board (*i.e.*, [Bernita] Buncher, and then [Doring]), who have irreplaceable institutional knowledge of the mission of the Foundation, remain on the

11

Board is definitive evidence of their loyalty to the Foundation.

[Appellants'] third claim is that the [Orphans'] Court erred in not finding that Jack Buncher's donative intent was "destroyed" by the actions of [Doring, Balestrieri, and Jackovic]. Nothing could be further from the truth. In fact, [Jack] Buncher's intentions, which are set forth clearly in the Trust document and the 1996 amendments to the By-Laws, were carefully considered by [Doring, Balestrieri, and Jackovic]. Although a list of charitable beneficiaries is set forth in the Trust, the document states, without ambiguity, that the [t]rustees have "broad discretion", exercisable "at any time", to identify the charitable recipients and the amount, nature, and character of the property granted to the recipients. Thus, the actions by the [t]rustees and the Directors of the Foundation in designating new beneficiaries was consistent with [Jack] Buncher's intentions. Interestingly, . . . although there has been heavy emphasis by [Appellants] with regard to [Jack] Buncher's intent to benefit members of the Jewish faith and "Jewish causes", the first time the words "Jewish faith" are found in either the Articles of Incorporation or the By-Laws of the Foundation is in [Article I, Section] 1.02 of the 2011 By-Laws, the enactment of which is being questioned by [Appellants]. Thus, not only has [Jack] Buncher's donative intent not been destroyed, it has been sustained and enhanced by the actions of [Doring, Balestrieri, and Jackovic].

(Orphans' Ct. Op., Apr. 23, 2019, at 2-4.)

## II.  ARGUMENTS ON APPEAL

On appeal to this Court,[3] Appellants argue that the Orphans' Court erred by not invalidating the Foundation's 2011 Articles and 2011 By-Laws because:  (1) by adopting the 2011 Articles and the 2011 By-Laws, Bernita Buncher, Doring, and

---

[3] "On appeal from an order of the Orphans' Court, this Court's scope of review is limited to determining whether the record is free from legal error and whether the court's factual findings are supported by the evidence." *In re Estate of Berry*, 921 A.2d 1261, 1263 n.1 (Pa. Cmwlth.), *appeal denied*, 934 A.2d 1279 (Pa. 2007).

Jackovic breached the duties of care, obedience, and loyalty that they owed to the Foundation; and (2) the 2011 Articles and the 2011 By-Laws constituted fundamental changes with respect to the administration of the Foundation and the distribution of the Foundation's assets—*i.e.*, the objects for which the assets of the Foundation were donated—that required prior approval from the Orphans' Court.[4]

## III.  DISCUSSION

### A.  Breach of Fiduciary Duty

Appellants argue that the Orphans' Court erred by not invalidating the Foundation's 2011 Articles and 2011 By-Laws because, by adopting the 2011 Articles and the 2011 By-Laws, Bernita Buncher, Doring, and Jackovic breached the duties of care, obedience, and loyalty that they owed to the Foundation.[5]  More specifically, Appellants contend that, pursuant to Article X of the 1996 By-Laws, any amendment to Article III, Section 10 of the 1996 By-Laws—*i.e.*, the provisions preserving the Buncher family's control over the Foundation—required not only the approval of the Senior Buncher Descendant but also the

---

[4] By order dated April 5, 2019, this Court noted that the Orphans' Court's order did not dispose of all of the parties' claims given that the Foundation's request for attorneys' fees remained outstanding and ordered the parties to address the appealability of the Orphans' Court's order in their principal briefs on the merits.  After reviewing the parties' briefs and hearing the parties' arguments on the appealability issue, we are satisfied that, although the Orphans' Court's order is not immediately appealable as a final order under Pa. R.A.P. 341, this Court has jurisdiction to hear this appeal under Pa. R.A.P. 342(a).

[5] Before the Orphans' Court, it appears that Appellants argued only that Doring, Balestrieri, and Jackovic breached their fiduciary duties to the Foundation by adopting the 2011 Articles and 2011 By-Laws.  In other words, Appellants did not argue or suggest that Bernita Buncher breached her fiduciary duties to the Foundation.  Rather, Appellants contended that Doring exercised undue influence over Bernita Buncher.  In this appeal, Appellants have abandoned their argument that Bernita Buncher was the subject of undue influence and, instead, argue that Bernita Buncher, Doring, and Jackovic, the three Directors that voted in favor of the 2011 Articles and the 2011 By-Laws, breached their fiduciary duties to the Foundation.

13

affirmative vote of a majority of the Foundation's Directors then in office. In other words, Appellants suggest that the provision set forth in Article III, Section 10(b) of the 1996 By-Laws that permits the Senior Buncher Descendant to cast a majority vote does not apply to an amendment to Article III, Section 10, because Article III, Section 10(b) cannot override the more specific language set forth in Article X and, even assuming it could, the record does not reflect that Bernita Buncher, the Senior Buncher Descendant, exercised her ability to cast a majority vote to approve the adoption of the Foundation's 2011 By-Laws. Appellants further contend that, in order to determine Jack Buncher's donative intent properly, the Orphans' Court was required to look beyond the Trust and 1996 By-Laws "to the facts and circumstances of [Jack] Buncher's life, the adopted purposes of the Foundation as reflected in its governing instruments, Board resolutions[] and other corporate documents, the Foundation's history of giving, and [Jack] Buncher's testamentary documents," which the Orphans' Court failed to do. (Appellants' Br. at 57.)

Appellants also contend that, in addition to the customary duties of care, loyalty, and obedience applicable to all directors of nonprofit corporations, Bernita Buncher, Doring, and Jackovic also owed a heightened duty to the Foundation to act as a trustee in their administration of the Foundation's assets. Appellants argue that Bernita Buncher, Doring, and Jackovic breached these fiduciary duties when they voted to adopt the Foundation's 2011 Articles and 2011 By-Laws because: (1) Bernita Buncher mistook the powers granted to her as the Senior Buncher Descendant as a basis to change the fundamental structure and purpose of the Foundation without any consideration of Jack Buncher's intentions for the Foundation; (2) Doring engaged in self-dealing given that the Foundation's 2011 By-Laws grant him "the ability to remove any directors without cause,

14

effectively making him the sole decision-maker on all Foundation matters, including grants[,] enable him to transfer the Foundation's assets to a donor-advised fund that he or his family can direct[,] and cement[] his control of the Company that employs him and his son"; and (3) Jackovic failed to exercise any independent judgment— *i.e.*, he did not consider the reasons for the amendments or Jack Buncher's intentions—but instead voted in favor of the adoption of the 2011 Articles and 2011 By-Laws simply because he thought Bernita Buncher wanted him to do so. (Appellants' Br. at 38.) In sum, Appellants contend that, given the need for a majority vote in favor of the adoption of the Foundation's 2011 Articles and 2011 By-Laws and Balestrieri's abstention from such vote, even if only one of Bernita Buncher, Doring, or Jackovic breached their fiduciary duties to the Foundation, the 2011 Articles and 2011 By-Laws must be invalidated.[6]

In response, the Foundation and Doring[7] argue that the Orphans' Court properly concluded that Bernita Buncher, Doring, and Jackovic fulfilled their fiduciary duties to the Foundation when they voted in favor of the adoption of the 2011 Articles and 2011 By-Laws. More specifically, the Foundation and Doring contend that the Orphans' Court properly ascertained Jack Buncher's intent from the

---

[6] In their brief, Appellants spend a considerable amount of time suggesting that the Orphans' Court's opinions in this matter—*i.e.*, the February 12, 2019 opinion issued at the conclusion of the 9-day hearing and the Rule 1925(a) opinion issued on April 23, 2019, in response to this appeal—are internally inconsistent and contradictory, specifically related to the issue of whether Bernita Buncher was authorized to cast a majority vote to adopt the 2011 By-Laws. We have reviewed both of the Orphans' Court's opinions, and we are satisfied that the Orphans' Court's opinions are not internally inconsistent or contradictory. The Orphans' Court issued the opinions at different stages of the proceedings in response to arguments presented by Appellants at the time. To the extent that the subject matter or the Orphans' Court's rationale may differ, we view such difference simply as a response to Appellants' arguments.

[7] While Doring, Balestrieri, Jackovic, and the Foundation were named as respondents before the Orphans' Court, based on our review of the docket in this matter, it appears that only the Foundation and Doring have filed a brief in opposition to Appellants' appeal.

15

"four corners" of the Trust and the 1996 By-Laws because both documents are clear and unambiguous. The Foundation and Doring argue that the Trust clearly and unambiguously provides that the trustees for the Trust had "broad discretion" to change the charitable beneficiaries identified on Schedule II of Schedule B of the Trust. The Foundation and Doring also argue that the 1996 By-Laws clearly and unambiguously provide that Bernita Buncher herself, as the Senior Buncher Descendant on the Board following Jack Buncher's death, had the authority to alter and amend Article III, Section 10 of the 1996 By-Laws. The Foundation and Doring suggest that the Senior Buncher Descendant's authority to cast the majority vote on any issue is not in any way restricted by Article X of the 1996 By-Laws, because Article III, Section 10(b) specifically provides that the Senior Buncher Descendant is authorized to cast a majority vote "[n]otwithstanding anything to the contrary in the [1996] By-Laws." They also suggest that the 1996 By-Laws did not require Bernita Buncher to expressly state that she was exercising her right to cast the majority vote on the adoption of the 2011 Articles and 2011 By-Laws. The Foundation and Doring further contend that, given that Jack Buncher's testamentary intent is clearly and unambiguously set forth within the four corners of the Trust and the 1996 By-Laws, the Orphans' Court properly restrained itself from considering any statements of Jack Buncher's intentions as set forth in the minutes from the Board's December 4, 1989 meeting and Jack Buncher's written statement that was made part of the Foundation's records at the time of the Board's June 14, 1990 meeting. The Foundation and Doring also contend that, contrary to Appellants' arguments, Bernita Buncher, Doring, and Jackovic were not subject to the heightened duty to act as a trustee in their administration of the Foundation's assets, and that the Orphans' Court properly determined that Bernita Buncher, Doring, and

Jackovic did not violate the fiduciary duties that they did owe to the Foundation by voting to adopt the 2011 Articles and 2011 By-Laws.

The Commonwealth of Pennsylvania (Commonwealth) argues that the Orphans' Court properly concluded that Bernita Buncher, Doring, and Jackovic did not breach their fiduciary duties when they voted in favor of the adoption of the 2011 Articles and 2011 By-Laws because Article III, Section 10 and Article X of the Foundation's 1996 By-Laws "unambiguously authorized the Board to" enact the 2011 Articles and 2011 By-Laws. (Commonwealth's Br. at 21-22.) The Commonwealth argues further that, given that the 2011 Articles and 2011 By-Laws were enacted "in conformity with the unambiguous structural safeguards that Jack [Buncher] had established," the Orphans' Court properly concluded that the 2011 Articles and 2011 By-Laws should not have been invalidated. (Commonwealth's Br. at 27.)

A director of a nonprofit corporation stands in a fiduciary relation to the corporation and is required to perform his/her duties "in good faith, in a manner he[/she] reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." Section 5712 of the Nonprofit Corporation Law of 1988 (Law), 15 Pa. C.S. § 5712. In addition to this duty of care, a director of a nonprofit corporation also has a duty of loyalty and obedience. *Cmwlth. by Kane v. New Foundations, Inc.*, 182 A.3d 1059, 1067 (Pa. Cmwlth. 2018) (*New Foundations*). "The duty of loyalty requires that [a] corporate director[] devote [himself/herself] to corporate affairs with a view to promote the common interests and not only [his/her] own, and that [he/she] cannot directly or indirectly utilize [his/her] position to obtain any personal profit or

17

advantage." *Id.* Section 5728(a) of the Law, however, sets forth certain circumstances under which an interested director may engage in permissible self-dealing:

> A contract or transaction between a nonprofit corporation and one or more of its directors . . . shall not be void or voidable solely for that reason, or solely because the director . . . is present at or participates in the meeting of the board of directors that authorizes the contract or transaction, or solely because the vote of the director or officer is counted for that purpose, if:
>
> > (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors and the board authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors even though the disinterested directors are less than a quorum;
> >
> > (2) the material facts as to the director's . . . relationship or interest and as to the contract or transaction are disclosed or are known to the members entitled to vote thereon, if any, and the contract or transaction is specifically approved in good faith by vote of those members; or
> >
> > (3) the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or the members.

15 Pa. C.S. § 5728(a). The duty of obedience, as set forth in Section 5545 of the Law,[8] "requires that the director's decisions to expend funds substantively further the purpose for which the nonprofit was organized and not to any of its members, directors[,] or officers of the corporation." *New Foundations*, 182 A.3d at 1068.

Before we can address whether the Orphans' Court erred by failing to conclude that Bernita Buncher, Doring, and Jackovic breached their fiduciary duties

---

[8] 15 Pa. C.S. § 5545.

to the Foundation, we must first consider Appellants' proposition that Bernita Buncher, Doring, and Jackovic were subject not only to the customary duties of care, loyalty, and obedience applicable to all directors of nonprofit corporations, but also to the heightened duty to act as a trustee in their administration of the Foundation's assets. In support of their proposition, Appellants direct our attention to this Court's decision in *New Foundations.* Appellants contend that, in *New Foundations*, this Court confirmed that, pursuant to Section 5547(a) of the Law,[9] trust principles apply to all directors of nonprofit corporations.

Appellants have grossly mischaracterized this Court's analysis and holding in *New Foundations*. In *New Foundations*, we considered the issue of "whether the actions of directors of nonprofits formed for charitable purposes are governed by the same standard as other nonprofit directors, or whether [Section 5547(a) of the Law] deems all the charitable assets held 'in trust,' making those directors' standard of care the same as trustees of a charitable trust." *New Foundations*, 182 A.3d at 1070. We noted that "[t]he answer to this question is important because if all the assets are held in trust, then trust principles apply to directors of nonprofits[, and, u]nlike

---

[9] 15 Pa. C.S. § 5547(a). Section 5547(a) of the Law provides:

> Every nonprofit corporation incorporated for a charitable purpose or purposes may take, receive and hold such real and personal property as may be given, devised to, or otherwise vested in such corporation, in trust, for the purpose or purposes set forth in its articles. The board of directors or other body of the corporation shall, as trustees of such property, be held to the same degree of responsibility and accountability as if not incorporated, unless a less[er] degree or a particular degree of responsibility and accountability is prescribed in the trust instrument, or unless the board of directors or such other body remain under the control of the members of the corporation or third persons who retain the right to direct, and do direct, the actions of the board or other body as to the use of the trust property from time to time.

19

[Section 5728 of the Law], which permits self-dealing in certain circumstances, self-dealing is much more proscribed when involving charitable assets." *Id.* at 1070-71. After performing a textual analysis of the language set forth in Section 5547(a) of the Law, we concluded that

> a director of a nonprofit charitable corporation *does not have the equivalent obligation of a trustee* but the director, when exercising his or her fiduciary duties, must take into consideration what is "in the best interests" of the corporation. This includes acting with due care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances. The director must also take into consideration that the primary purpose is to advance the charitable purposes of the corporation.

*Id.* at 1074 (emphasis added). In reaching this conclusion, we specifically noted that "if the General Assembly wanted trust principles to apply to all assets committed to the charitable purpose, it would have said so, just like it said so with regard to [the] diversion of charitable assets" in Section 5547(b) of the Law.[10] *Id.* For these reasons, we simply cannot agree with Appellants' proposition that, pursuant to our decision in *New Foundations*, Bernita Buncher, Doring, and Jackovic were subject, not only to the customary duties of care, loyalty, and obedience applicable to all directors of nonprofit corporations, but also to the heightened duty to act as a trustee in their administration of the Foundation's assets.[11]

---

[10] 15 Pa. C.S. § 5547(b).

[11] Following oral argument, Appellants directed our attention to our more recent unreported decision in *In re: Independent Fire Co. No. 1* (Pa. Cmwlth., No. 1489 C.D. 2018, filed Feb. 5, 2020) (*Independent Fire*). Appellants contend that our decision in *Independent Fire* affirmed the continued vitality and importance that a charitable nonprofit corporation's assets are held in trust and that the fiduciary duties of the directors of such nonprofit corporation are established by trust principles, not corporate law principles. Appellants have again mischaracterized this Court's analysis and holding. In *Independent Fire*, the Commonwealth

20

sought to have a charitable nonprofit corporation's assets distributed to a separate entity pursuant to the *cy pres* doctrine. *Independent Fire*, slip op. at 1-3. In support thereof, the Commonwealth argued, *inter alia*, that, pursuant to Section 5547(a) of the Law, all of the nonprofit corporation's assets were held in trust. *Id.*, slip op. at 13-14. In rejecting the Commonwealth's argument, we explained:

> While the doctrine of *cy pres* presupposes (above all else) the existence of a "trust," the Commonwealth's argument rests on the faulty premise that all of the assets and property that [the nonprofit corporation] owns are, *per se*, placed into a "trust." In [*New Foundations*], . . . this Court concluded as much. In that decision, we analyzed Section 5547(a) of the [Law] to determine whether the board of directors of nonprofits were acting as trustees with respect to trust property or as a corporate fiduciary concerning property that was not held in trust. We observed that resolution of this issue necessitated an examination of what assets were held in trust by the nonprofits in order to decide the applicable standard to be imposed upon the board and whether trust principles or corporate law principles controlled the board's decision-making.

> In [*New Foundations*], the Commonwealth argued that Section 5547(a) of the [Law] "means that all assets of the [nonprofits], whether they be in cash or other personalty or realty, are imbued with the corporations' charitable purposes and, as such, are held in trust for the benefit of the public at large." The Commonwealth further maintained that Section 5547(a) "encompasses all the assets of a nonprofit corporation formed for charitable purposes, not only assets that have been expressly donated." This Court, however, rejected the Commonwealth's assertions. . . .

> . . . [W]e pointed out that in Section 5547(b) of the [Law], the General Assembly specifically stated that the doctrine of *cy pres* applies where a nonprofit "diverts" any of its assets, whether it be in the event of voluntary dissolution, involuntary liquidation and dissolution, or a general asset transfer. However, as explained by this Court, the General Assembly omitted the doctrine from Section 5547(a). Accordingly, this Court, drawing a distinction between assets that a nonprofit receives from a third party and assets that a nonprofit seeks to transfer to a third party, concluded that "if the General Assembly wanted trust principles to apply to all assets

21

With these principles regarding the fiduciary duties of directors of charitable nonprofit corporations in mind, we now consider whether the Orphans' Court erred by failing to conclude that Bernita Buncher, Doring, and Jackovic breached their fiduciary duties to the Foundation by voting in favor of the adoption of the 2011 Articles and 2011 By-Laws. The crux of Appellants' argument appears to be that Bernita Buncher, Doring, and Jackovic breached their fiduciary duties to the Foundation because they did not consider Jack Buncher's wishes and intentions for

---

committed to the charitable purpose, it would have said so, just like it said so with regard to diversion of charitable assets."

Pursuant to [*New Foundations*], Section 5547(a) denotes that a nonprofit holds in "trust" only those assets or property that were "given, devised to, or ... vested" in it from an outside source. Or, phrased differently, a nonprofit holds assets or property in "trust" when the outside source "donated[,] granted, or devised" the assets or property to the nonprofit, including when the outside source commits assets pursuant to an express trust. . . . Ultimately, it is these types of assets, or, more precisely, the manner in which these assets are transferred and/or otherwise devoted to a nonprofit, that potentially renders them subject to the doctrine of *cy pres*. However, all other assets owned by a nonprofit, which do not fall within this general category, cannot be effectively seized and transferred to another nonprofit pursuant to the legal concept of *cy pres*, unless the nonprofit itself has taken its assets and created its own charitable trust for those assets, or the Commonwealth secures involuntary dissolution of the nonprofit. Succinctly put, and contrary to the overall thrust of the Commonwealth's argument, a charitable nonprofit corporation is not synonymous with a charitable trust and the two are not one and the same.

*Id.*, slip op. at 14-18 (footnotes omitted) (citations omitted). In sum, in *Independent Fire*, we did not in any way discuss or consider whether a director of a charitable nonprofit corporation is, in addition to the fiduciary duties applicable to the directors of all nonprofit corporations, subject to the heightened duties of a trustee. Rather, we considered the limited issue of whether our decision in *New Foundations* established that all assets of a charitable trust are held in trust such that the assets would be subject to the doctrine of *cy pres*. As a result, our decision in *Independent Fire* has no applicability to the issues presented in this case.

22

the Foundation—*i.e.*, that the Foundation would always be controlled by his descendants, would focus primarily on Jewish charities, and would exist indefinitely—as expressed in, *inter alia*, the minutes of the Board's December 4, 1989 meeting and Jack Buncher's written statement that was made part of the Foundation's records at the time of the Board's June 14, 1990 meeting. We will address each of Jack Buncher's alleged wishes and intentions for the Foundation separately below.

First, while it may be undisputed that Jack Buncher expressed his hope and intention that a Buncher family member would always be in control of the Foundation, it is also undisputed that Jack Buncher, along with the other members of the Board, enacted the 1996 By-Laws, which specifically authorized the Board to amend or remove Article III, Section 10 with the approval of the Senior Buncher Descendant. Jack Buncher and the rest of the Board could have completely restricted the Board's ability to amend or remove Article III, Section 10 of the 1996 By-Laws, but they did not do so. Rather, Jack Buncher and the rest of the Board left the decision to amend or remove Article III, Section 10 of the 1996 By-Laws to the Board with the approval of the Senior Buncher Descendant. We simply cannot see how Bernita Buncher, Doring, and Jackovic could have breached their fiduciary duties to the Foundation by removing the Senior Buncher Descendant position on the Board when the 1996 By-Laws permitted them to do so.

Second, there is no evidence of record to suggest that Bernita Buncher, Doring, and Jackovic ignored and/or destroyed Jack Buncher's donative intent with respect to the focus of the Foundation's charitable giving. In fact, quite the opposite is true. In March 1994, approximately 4 years after his personal thoughts and aspirations regarding his intended support of certain Jewish organizations and

23

programs were made part of the Foundation's records, Jack Buncher executed the Fourth Restated and Amended Revocable Declaration of Trust for the Trust. In Schedule II of Schedule B of the Trust, Jack Buncher requested that, within 5 years of the date on which the Company's stock is transferred to the Foundation, the Board redistribute a portion of the Company's stock to certain enumerated Jewish organizations. (R.R. at 136a-37a.) Despite this enumeration of specific Jewish organizations, however, Jack Buncher granted the trustees "broad discretion" to remove and/or replace those organizations. (*Id.* at 138a-39a.) In selecting the Carnegie Libraries, Carnegie Mellon University, the American Jewish Joint Distribution Committee, the Pittsburgh Foundation, and the United Jewish Federation as organizations with which the Foundation would align, Bernita Buncher did not eliminate support for Jewish organizations from the Foundation's charitable giving; she simply exercised the discretion given to her by Jack Buncher as a trustee for the Trust and a member of the Board while also continuing the Foundation's support of certain Jewish organizations.

In fact, Jack Buncher specifically referenced the United Jewish Federation and the American Jewish Joint Distribution Committee on Schedule II of Schedule B of the Trust. (*Id.* at 137a.) It is also important to note that Article I, Section 1.02 of the 2011 By-Laws indicates that the Foundation was incorporated to support, *inter alia*, "programs that further the physical, educational and spiritual needs and well-being of individuals, particularly including those that provide care and services to the elderly and those that serve individuals of the Jewish faith (including education and healthcare in Israel)." (*Id.* at 2323a.) This appears to be the first time that the Board specifically referenced the Jewish faith in the Foundation's governing documents. (*Id.*)

24

Given that the Board continued the Foundation's support of Jewish organizations following Jack Buncher's death and exercised the discretion given to it by Jack Buncher in its selection of supporting organizations, we do not believe that Bernita Buncher, Doring, and Jackovic ignored and/or destroyed Jack Buncher's donative intent with respect to the focus of the Foundation's charitable giving, and, therefore, we cannot conclude that Bernita Buncher, Doring, and Jackovic breached their fiduciary duties by adopting the 2011 Articles and 2011 By-Laws, specifically those provisions that establish the Foundation's purpose and the focus of the Foundation's charitable giving.

Third, contrary to Appellants' assertions, the 2011 By-Laws do not effectively put an end to the Foundation. Article X, Section 10.01 essentially provides a framework for the continuation of both the Foundation and its charitable purposes following Bernita Buncher's and Doring's tenure as Directors of the Foundation. Article X, Section 10.01 provides that, within 5 years of the cessation of Bernita Buncher's or Doring's tenure as a Director of the Foundation, whichever occurs later, the Company's Voting Common Stock and 10% of the value of the Foundation's non-Company assets would remain with the Foundation. (R.R. at 2336a.) The Foundation's remaining assets, including the Company's Non-Voting Common and Preferred Stock and 90% of the value of the Foundation's non-Company assets, would be transferred to The Pittsburgh Foundation "to be held in a fund for the purposes set forth in [Article I,] Section 1.02" of the Foundation's 2011 By-Laws. (*Id.*) In other words, not only would the Foundation continue with its retention of certain assets, but its charitable purposes would continue to be fulfilled by The Pittsburgh Foundation. We do not view Article X, Section 10.01 of the 2011 By-Laws as effectively putting an end to the Foundation's

25

existence or purposes, and, therefore, we cannot conclude that Bernita Buncher, Doring, and Jackovic breached their fiduciary duties to the Foundation by adopting the 2011 By-Laws, specifically Article X, Section 10.01.

Generally speaking, it is also important to recognize that the Board's decision to adopt the 2011 Articles and 2011 By-Laws was not a decision that the Board made overnight; rather, the Board considered potential changes to the Foundation's governing documents over a period of approximately 10 years while it was going through a period of transition. Additionally, we cannot agree with Appellants that Doring somehow engaged in impermissible self-dealing when he voted in favor of the adoption of the 2011 Articles and 2011 By-Laws. Just because Doring will succeed to Bernita Buncher's rights with respect to the appointment and removal of directors of the Foundation upon Bernita Buncher's death, incapacity, or resignation does not mean that Doring will somehow receive a personal benefit or advantage as the successor to Bernita Buncher. If and when he succeeds to Bernita Buncher's position on the Board, Doring will be required to exercise his authority in accordance with the Foundation's stated purposes. For all of the above-stated reasons, we cannot conclude that the Orphans' Court erred by failing to determine that Bernita Buncher, Doring, and/or Jackovic breached the duties of care, obedience, and loyalty that they owed to the Foundation when they voted in favor of the adoption of the 2011 Articles and 2011 By-Laws.[12]

---

[12] Given our conclusion that the Orphans' Court did not err by failing to conclude that Bernita Buncher, Doring, and Jackovic breached their fiduciary duties to the Foundation by adopting the 2011 Articles and 2011 By-Laws, we need not consider whether Bernita Buncher was permitted to cast the majority vote to amend Article III, Section 10 of the 1996 By-Laws, because a majority of the Board voted in favor of the adoption of the 2011 By-Laws—*i.e.*, Bernita Buncher's majority vote, even if permitted, was not needed to adopt the 2011 By-Laws.

## B. Fundamental Changes

Appellants argue that the Orphans' Court erred by not invalidating the Foundation's 2011 Articles and 2011 By-Laws because the 2011 Articles and the 2011 By-Laws constituted fundamental changes with respect to the administration of the Foundation and the distribution of the Foundation's assets—*i.e.*, the objects for which the assets of the Foundation were donated—that required prior approval from the Orphans' Court. More specifically, Appellants contend that the fundamental changes embodied in the Foundation's 2011 Articles and 2011 By-Laws—*i.e.*, the elimination of "the method of selection of directors dictated by Jack Buncher, namely, that they be selected in part from the members of his family," the change of the Foundation's purpose to "formally end the Jewish focus to its giving," and the "end to the Foundation via the mandated transfer of substantially all of its assets in the near future"—could not be undertaken without the Orphans' Court's approval. (Appellants' Br. at 45.)

In response, the Foundation, Doring and the Commonwealth argue that the 2011 Articles and 2011 By-Laws did not contain any fundamental changes that would have required the prior approval of the Orphans' Court because: (1) the alteration, amendment, or repeal of Article III, Section 10 was expressly permitted by the 1996 By-Laws; (2) the amendments set forth in the 2011 Articles and 2011 By-Laws do not change and are entirely consistent with the original purposes of the Foundation and the broad discretionary powers granted to the trustees under the Trust; and (3) the 2011 By-Laws do not bring an end to the Foundation, but rather, create a necessary succession plan that is consistent with Jack Buncher's donative intent.

27

Pursuant to Section 5547(b) of the Law, "[p]roperty committed to charitable purposes shall not . . . be diverted from the objects to which it was donated, granted or devised, unless and until the board of directors . . . obtains" the Orphans' Court's approval. For the reasons explained more fully above, the Board's adoption of the 2011 Articles and 2011 By-Laws does not amount to a fundamental change under Section 5547(b) that would require the Orphans' Court's prior approval.

First, the removal of Article III, Section 10 from the Foundation's 1996 By-Laws—more specifically, the removal of the Senior Buncher Descendant position on the Board—was expressly permitted by the 1996 By-Laws, provided that the Senior Buncher Descendant, in this case Bernita Buncher, agreed to its removal, which she did when she voted in favor of the adoption of the 2011 By-Laws. Second, the amendments to the Foundation's stated purposes did not end the Jewish focus of the Foundation's charitable giving, rather, such amendments continued the Foundation's support of Jewish organizations and programs, as Article I, Section 1.01 of the Foundation's 2011 By-Laws specifically references the Jewish faith. Third, Article X, Section 10.01 of the Foundation's 2011 By-Laws did not effectively put an end to the Foundation, because, even when Article X, Section 10.01 is implemented, the Foundation will continue in existence with its retention of certain assets and The Pittsburgh Foundation will continue to fulfill the Foundation's charitable purposes. In other words, even with the transfer of certain of the Foundation's assets to The Pittsburgh Foundation, the Foundation's assets will not "be diverted from the objects to which [they were] donated, granted or devised" because The Pittsburgh Foundation will be required to adhere to the Foundation's stated purposes in its administration of the Foundation's assets. *See* Section 5547(b) of the Law.

28

## IV. CONCLUSION

For all of these reasons, we cannot conclude that the Orphans' Court erred by not invalidating the Foundation's 2011 Articles and 2011 By-Laws. Accordingly, we affirm the Orphans' Court's order.

P. KEVIN BROBSON, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Jack Buncher Foundation      :
     :
     :    No. 306 C.D. 2019
Appeal of: Amy Rubinoff,      :
Caryn Rubinoff, Michael Rubinoff,      :
and Daniel Rubinoff      :

# **O R D E R**

AND NOW, this 1st day of July, 2020, the order of the Court of Common Pleas of Allegheny County, Orphans' Court Division, is hereby AFFIRMED.

P. KEVIN BROBSON, Judge